IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GAIL BLACKBURN,                      )
                                     )
                Plaintiff,           )
                                     )
      v.                             )          No. 1:09-CV-497
                                     )
THE TRUSTEES OF GUILFORD             )
TECHNICAL COMMUNITY COLLEGE,         )
                                     )
                Defendant.           )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court is the motion of Defendant, The Trustees of Guilford Technical Community College ("GTCC"), to dismiss the Second Amended Complaint of Plaintiff Gail Blackburn ("Blackburn") pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). (Doc. 29.) GTCC argues that Blackburn has failed to state a claim upon which relief can be granted and that her cause of action under Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., is barred by sovereign immunity. The arguments of the parties have been fully briefed, and the matter is ripe for decision. For the reasons set forth below, the motion is DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The Second Amended Complaint alleges the following: Blackburn was hired by GTCC on July 10, 2006, and worked as a housekeeper. (Doc. 28-1 ¶¶ 8(a), 8(b).)  On September 18, 2007, as a result of workplace injuries, she was placed on work restrictions requiring that she lift no more than 20 pounds, not stand or sit for a prolonged time, and not repetitively bend, stoop, or squat.  (Id. ¶ 8(d).)  On December 10, 2007, Blackburn's physician released her to return to work "with restrictions."  (Id. ¶ 8(e).)  However, GTCC did not allow Blackburn to return to work because it perceived that she was disabled and could not perform her job.  Thus, it is alleged, GTCC refused to attempt to accommodate Blackburn's limitations and, on March 12, 2008, terminated her employment.  (Id. ¶¶ 8(f) to 8(i).)  Despite her medical limitations, she alleges, she was "capable of performing modified duties of a regular job" as well as several available suitable positions and could still perform the essential functions of her employment position, with or without reasonable accommodations.  (Id. ¶¶ 8(j) to 8(l).) Blackburn contends that GTCC unlawfully discriminated against her in violation of Title I of the ADA, 42 U.S.C. § 12101 et seq., and section 504 of the Rehabilitation Act of 1973 (as amended), 29 U.S.C. § 794(a), and seeks a declaratory judgment,

injunctive relief, damages, and fees.[1] (Doc. 28-1 ¶¶ 1, 13, 14, Prayer for Relief.)

## II. ANALYSIS

### A. Sovereign Immunity under the Eleventh Amendment

GTCC seeks dismissal of Blackburn's claim under Title I of the ADA pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(2), arguing that the court lacks jurisdiction over it.[2]

---

[1] GTCC previously moved to dismiss an earlier version of the complaint on the grounds that GTCC enjoyed sovereign immunity as well as for failure to state a claim. (Doc. 14.) The court granted the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) because Blackburn failed to allege that she was a "qualified individual" under the ADA, thus rendering moot the sovereign immunity argument. See Blackburn v. Trs. of Guilford Technical Cmty. Coll., 733 F. Supp. 2d 659, 662 n.1, 664-66 (M.D.N.C. 2010). Because the pleading deficiency could be cured, the court dismissed the case without prejudice. The present motion arises as a result of Blackburn's re-pleading attempt, and the court relies in part on the parties' briefing concerning GTCC's first motion to dismiss.

[2] GTCC does not discuss Rule 12(b)(1) or Rule 12(b)(2) in its brief. GTCC does allege that the court lacks jurisdiction over Blackburn's Title I claim on the grounds that the Eleventh Amendment grants GTCC sovereign immunity. Eleventh Amendment immunity has aspects of both subject matter and personal jurisdiction, but it does not fall under either category. Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 479-83 (4th Cir. 2005). Further, the Fourth Circuit has not ruled on whether dismissing a suit on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). See Andrews v. Daw, 201 F.3d 521, 524 n.2 (4th Cir. 2000). Courts generally consider motions alleging Eleventh Amendment immunity under Rule 12(b)(1), however. See, e.g., Johnson v. N.C. Dept. of Health & Human Servs., 454 F. Supp. 2d 467 (M.D.N.C. 2006); RPR & Assocs. v. O'Brien/Atkins Assocs., P.A., 921 F. Supp. 1457, 1460 (M.D.N.C. 1995), aff'd per curiam, 103 F. App'x 120, 1996 WL 680724 (4th Cir. 1996); see also Trantham v. Henry Cnty. Sheriff's Office, No. 4:10CV00058, 2011 WL 863498, at *3 (W.D. Va. March 10, 2011) (noting "recent trend among the district courts within the Fourth Circuit to consider sovereign immunity under Rule 12(b)(1)"), aff'd per curiam, No. 11-1337, 2011 WL 2438677 (4th Cir.

GTCC contends that the Eleventh Amendment grants it immunity from claims brought under Title I.

A plaintiff bears the burden of proving this court's subject matter jurisdiction. Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991). When evaluating a challenge to subject matter jurisdiction under Rule 12(b)(1), the court may look beyond the face of the complaint and consider other evidence outside the pleadings without converting the motion to one for summary judgment. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). A court should dismiss for lack of federal subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Richmond, 945 F.2d at 768 (citation omitted).

With certain exceptions, the Eleventh Amendment prohibits suits against the States.[3] This immunity extends to any State instrumentality that is considered an "arm of the State." Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429-30 (1997). State-funded colleges and universities structured to

---

June 20, 2011) (slip opinion). Therefore, the court will consider this motion pursuant to Rule 12(b)(1).

[3] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

have close ties to the State are considered "arm[s] of the State" for Eleventh Amendment purposes. Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 263 (4th Cir. 2005); Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1138 (4th Cir. 1990). GTCC is State-funded, N.C. Gen. Stat. § 115D-31, and any judgment against it would be satisfied with State funds, Miller v. Guilford Technical Cmty. Coll., No. 2:96CV00329, 1998 U.S. Dist. LEXIS 15153, at *6 (M.D.N.C. June 15, 1998). Thus, as GTCC contends, it is an "arm of the State" and, absent an applicable waiver, is immune from private lawsuits in federal court under the Eleventh Amendment. Id. (finding GTCC an arm of the State of North Carolina and, prior to enactment of N.C. Gen. Stat. § 143-300.35(a), immune from suit in federal court); Jackson v. Hopper, No. 1:05CV96, 2007 WL 4320741, at *2 (M.D.N.C. Jan. 25, 2007) (finding Piedmont Community College an "agency of the State of North Carolina" entitled to Eleventh Amendment immunity in suit by prisoner/student), aff'd per curiam, 241 F. App'x 949 (4th Cir. 2007).

However, an immunity defense is unavailable if Congress has abrogated a State's immunity in the exercise of its power under the Fourteenth Amendment or the State has waived its sovereign immunity by consenting to suit in federal court. Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999). With respect to the first exception, Congress

5

explicitly invoked its "power to enforce the fourteenth amendment and to regulate commerce" in the text of the ADA. 42 U.S.C. § 12101(b)(4). Congress provided that a "State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202. However, in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001), the Supreme Court held that Congress's reliance on the Fourteenth Amendment to abrogate State immunity from private lawsuits under Title I of the ADA was invalid insofar as it applied to suits for damages. Id. at 374. Therefore, absent other waiver, individuals cannot sue State agencies under Title I of the ADA for damages, but they may sue for injunctive relief. Id. at 369-74.

With respect to the second exception, the North Carolina General Assembly, in the wake of Garrett, passed the State Employee Federal Remedy Restoration Act ("SEFRRA") in 2001 to waive sovereign immunity for State employees seeking to bring suit in federal court under the ADA. SEFRRA states:

> The sovereign immunity of the State is waived for the limited purpose of allowing State employees, except for those in exempt policy-making positions designated pursuant to G.S. 126-5(d), to maintain lawsuits in State and federal courts and obtain and satisfy judgments against the State or any of its departments, institutions, or agencies under . . . [t]he Americans with Disabilities Act.

6

N.C. Gen. Stat. § 143-300.35(a). Thus, Garrett applies to all States; but North Carolina, to the extent set forth in SEFRRA, consents to all claims, including those for damages. See Wright v. N.C. Dept. of Health & Human Servs., Office of Educ. Servs., 405 F. Supp. 2d. 631, 635 (E.D.N.C. 2005).

SEFRRA waives sovereign immunity for "State employees" but does not define them. It is therefore silent as to whether community college employees in North Carolina are "State employees" under the statute. The parties have not identified, nor has the court found, any reported decision of a State or federal court in North Carolina that addresses whether community college employees are State employees for purposes of SEFRRA. One case has noted that whether an employee of a community college is a State employee is a "close question," but it did not reach the issue. See Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432, 446 (M.D.N.C. 2003), aff'd per curiam, 80 F. App'x 819 (4th Cir. 2003).

GTCC argues that because SEFRRA references N.C. Gen. Stat. § 126-5(d) to define the "policy-making positions" exempted from the sovereign immunity waiver, the court should look to Chapter 126 to define "State employees." Section 126-5 does not define "State employees," however. Rather, it establishes which employees are covered by or exempted from the State Personnel System ("SPS") - a system of personnel administration that

classifies positions paid by the State, sets compensation, and mandates conditions of employment.

GTCC contends that only those employees covered by the SPS should be considered "State employees." It argues that because section 126-5(c2)(3) specifically exempts from the SPS "[e]mployees of community colleges whose salaries are fixed in accordance with the provisions of G.S. 115D-5 and G.S. 115D-20," Blackburn is exempted from the SPS. Thus, GTCC argues, Blackburn should not be considered a "State employee" contemplated by SEFRRA. GTCC further points to a provision of section 126-5 that identifies "State employees" separately from "community college employees" and contends that this evidences legislative intent to treat community college employees separately from "State employees" for purposes of SEFRRA. See N.C. Gen. Stat. §§ 126-5(c5), (c6) (noting that Articles 14 and 15 "of this Chapter shall apply to all State employees, public school employees, and community college employees.")

Blackburn argues that a plain reading of SEFRRA makes clear that the only employees excluded from SEFRRA are those in public policy-making positions. Had the legislature wished to exclude all employees who were excluded from the SPS, Blackburn argues, the statute would have stated as much.

SEFRRA plainly states that North Carolina waived its sovereign immunity to ADA claims for all "State employees"

except those in certain exempt policy-making positions under N.C. Gen. Stat. § 126-5(d). N.C. Gen. Stat. § 143-300.35(a). GTCC does not argue that Blackburn is listed as an exempt policymaker within section 126-5(d), nor is there any indication that as a housekeeper she falls within that exception. Had the General Assembly meant for SEFRRA to apply only to those employees covered under the SPS, moreover, it could have easily and plainly said so. Instead, it only excluded employees in public policy-making positions defined in section 126-5(d). Under the doctrine of statutory construction *expressio unius est exclusio alterius*, meaning "the expression of one thing implies the exclusion of another," the General Assembly's limited exclusion necessarily left all other "State employees" free to sue under the ADA. See Ayes v. U.S. Dept. of Veterans Affairs, 473 F.3d 104, 110-11 (4th Cir. 2006) (defining this "time-honored maxim"); Kinlaw v. Harris, 364 N.C. 528, 535, 702 S.E.2d 294, 298 (2010) (applying doctrine). In this respect, therefore, Blackburn is correct.

Exemption from the SPS, moreover, does not render a person incapable of being a "State employee." Many State employees are exempted from the SPS, such as employees in public policy-making positions defined in section 126-5(d), all public school employees, see N.C. Gen. Stat. § 126-5(c2)(1), and other employees traditionally considered State employees, see, e.g.,

9

N.C. Gen. Stat. § 126-5(c1) (exempting all employees of the Judicial Department, all employees of the General Assembly, and employees of the North Carolina State Ports Authority). The North Carolina Supreme Court has also acknowledged that the SPS exempts certain "State employees." Powell v. N.C. Dept. of Trans., 347 N.C. 614, 616, 499 S.E.2d 180, 181 (1998) ("The SPA [SPS] provides certain protections for state employees subject to its provisions. However, some state employees are not protected by the SPA. Elected officials, public school superintendents, principals, teachers, and other public school employees, for example, are not subject to most of the provisions of the SPA.") Employees of community colleges whose salaries are fixed in accordance with the provisions of N.C. Gen. Stat. §§ 115D-5 and 115D-20 are also exempted from the SPS. N.C. Gen. Stat. § 126-5(c2)(3).

That the SPS does not include all State employees and that SEFRRA exempts only a limited subset of policy-makers, however, does not resolve whether community college employees are "State employees" within the meaning of N.C. Gen. Stat. § 143-300.35(a). In this respect, the parties' analysis is incomplete. There are several indications, however, that community college employees are "State employees."

The court begins by acknowledging that "rules of statutory construction dictate that waivers of sovereign immunity 'must be

construed strictly in favor of the sovereign and not enlarged beyond what the language requires.'" Middlebrooks v. Leavitt, 525 F.3d 341, 347 (4th Cir. 2008) (quoting United States v. Nordic Vill., Inc., 503 U.S. 30, 34 (1992)). A court "will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction.'" Edelman v. Jordan, 415 U.S. 651, 673 (1974) (quoting Murray v. Wilson Distilling Co., 213 U.S. 151, 171 (1909)).

First, SEFFRA provides expressly that sovereign immunity is waived for the limited purpose of "allowing State employees . . . to maintain lawsuits in State and federal courts and obtain and satisfy judgments against the State *or any of its departments, institutions, or agencies* . . ." under specified federal employment laws. N.C. Gen. Stat. § 143-300.35(a) (emphasis added). The reference to State "departments, institutions, or agencies" evidences a clear intent to permit employees of those entities to sue them. GTCC is a member of the North Carolina Community College System founded under N.C. Gen. Stat. § 115D. The purpose of section 115D is "to provide for the establishment, organization, and administration of a system of educational institutions throughout the State . . . ." N.C. Gen. Stat. § 115D-1. Indeed, section 115D-23 even refers to community college employees as "institutional employees."

N.C. Gen. Stat. § 115D-23. Moreover, the Community College System is deemed "a principal administrative department of State government" and falls "under the direction of the State Board of Community Colleges." N.C. Gen. Stat. § 115D-3. North Carolina law treats community colleges as a department of the State government. See Davis v. Cent. Piedmont Cmty. Coll., No. 3:07-cv-424-RJC, 2008 U.S. Dist. LEXIS 102111, at *11 (W.D.N.C. Dec. 3, 2008); N.C. Gen. Stat. § 115D-24 (waiver of governmental immunity). Community colleges have also been found to be an "agency" of the State of North Carolina. Conlin v. Southwestern Cmty. Coll., No. 2:99Cv247-C, 2001 WL 1019918, at *2 (W.D.N.C. Jan. 24, 2001) (finding that the "North Carolina Community College System and its constituent colleges are agencies of the State of North Carolina by virtue of their creation and governance under Chapter 115D"). Accordingly, GTCC appears to be a State department, institution and/or agency within the meaning of SEFRRA.[4]

Second, in its initial briefing (and before the court raised the issue of the application of SEFRRA), GTCC trumpeted heavily the fact that it is an "arm of the State" and, on that

---

[4] This conclusion is consistent with section 115D's requirement that "much of [a community college's] operations [] be governed by, or in compliance with, the State Board, leaving [the college] little autonomy from the State." Davis, 2008 U.S. Dist. LEXIS 102111, at *11.

basis, was immune from suit.[5]  (Doc. 15 at 14-15.)  It is logical

to conclude that, absent an express exemption (that does not

appear), employees of an entity that is an arm of the State may

be "State employees."  See Md. Stadium Auth., 407 F.3d at 263

(stating that colleges and universities funded by the State, and

which are structured to have close ties to the State, are

considered an "arm of the State" for Eleventh Amendment

purposes); Miller, 1998 U.S. Dist. LEXIS 15153, at *5-*6 (noting

GTCC is State-funded and an arm of the State); Davis, 2008 U.S.

Dist. LEXIS 102111, at *7-*9 (finding community college an arm

of the State).  As Blackburn aptly notes, it is logical that an

employee be either a federal employee, a State employee, or a

private employee, and if an employee's salary is set by the

State Board of Community Colleges, N.C. Gen. Stat. § 115D-5(a),

that employee is likely a State, not a private, employee.

---

[5]   GTCC relied on Peterson v. Davidson County Community College, 367
F. Supp. 2d 890 (M.D.N.C. 2005), as evidence that employees of
community colleges are not State employees.  In Peterson, the
plaintiff, an employee of Davidson Community College, sued the
community college, alleging a violation of the Age Discrimination in
Employment Act of 1967 ("ADEA").  The court stated that "there is no
state statute or constitutional provision demonstrating the state of
North Carolina's waiver of its immunity regarding the ADEA."
Peterson, 367 F. Supp. 2d at 893.  At the time, of course, SEFRRA
provided such a waiver for "State employees."  See N.C. Gen. Stat. §
143-300.35(a)(2).  While Peterson was decided four years after SEFRRA
was enacted, SEFRRA was never referenced in the opinion.  It thus
appears that the parties simply overlooked it (as they did here until
the court brought it to their attention and requested supplemental
briefing (Doc. 21)).

13

Third, the Office of State Personnel ("OSP"), the administrative agency established to implement the SPS, N.C. Gen. Stat. § 126-3(b)(1), defines "State employee" in a way that covers community college employees. The North Carolina Administrative Code defines "State employees," for purposes of the OSP, as "all employees of the State of North Carolina who are subject to *any part* of the State Personnel [System], unless otherwise indicated in this Chapter." 25 N.C. Admin. Code 1A.0003(5) (emphasis added). Community college employees are subject to both Article 14 and Article 15 of the SPS. See N.C. Gen. Stat. §§ 126-5(c5), (c6). Therefore, while the SPS itself does not define "State employees," the agency established to implement the SPS defines "State employees" in a fashion that covers community college employees.

Fourth, other North Carolina statutes have defined "State employees" in a way that includes community college employees. For example, N.C. Gen. Stat. § 143-345.20(3), which establishes the "State Employee Incentive Bonus Program," defines a "State employee" as follows:

> a. A person who is a contributing member of the Teachers' and State Employees' Retirement System of North Carolina, the Consolidated Judicial Retirement System of North Carolina, or the Optional Program.

> b. A person who receives wages from the State as a part-time or temporary worker, but is not otherwise a contributing member of one of the retirement programs listed in subdivision a . . . .

14

Neither GTCC nor Blackburn has indicated whether Blackburn contributes to the Teachers' and State Employee' Retirement System, but community college employees are eligible to do so. See N.C. Gen. Stat. § 115D-22. Another example is N.C. Gen. Stat. § 143-300.2, which defines the State entities whose employees may request that the State provide for the employees' defense when they are sued for their acts or omissions while performing their official duties "as a State employee." See N.C. Gen. Stat. § 143-300.3. The statute defines the "State" to include "community colleges," thus rendering their employees "State employees" who are eligible to request that the State provide for their defense. N.C. Gen. Stat. § 143-300.2(4).[6] Yet another example is N.C. Gen. Stat. § 135-45.1(11), which details the benefits system for "Teachers and State employees." It defines an "Employee or State employee" as "[a]ny permanent full-time or permanent part-time regular employee (designated as half-time or more) of an employing unit." An "employing unit" is defined to include "[a] North Carolina School System; Community College; State Department, Agency, or Institution; Administrative Office of the Courts; or Association or Examining

_____

[6]   N.C. Gen. Stat. § 143-300.2 provides: "'The State' includes all departments, agencies, boards, commissions, institutions, bureaus, and authorities of the State. Community colleges, technical colleges, and occupational licensing boards regulated by Chapter 93B of the General Statutes shall be deemed State agencies for purposes of this Article."

Board whose employees are eligible for membership in a State-Supported Retirement System." N.C. Gen. Stat. § 125-45.1(12). Therefore, though the term "State employee" is not defined in SEFRRA, the term is defined elsewhere to include community college employees for purposes of the State's employee benefits programs, bonus programs, and provision of legal defense.[7]

Fifth, GTCC's reliance on portions of section 126-5 that refer separately to "State employees" and "community college employees" ignores the structure of that statute. Under the heading of "Employees subject to Chapter; exemptions," section 126-5(a) provides that it shall apply to "[a]ll State employees not herein exempt," N.C. Gen. Stat. § 126-5(a)(1), certain defined "employees of . . . local entities," § 126-5(a)(2), and certain "[c]ounty employees," § 126-5(a)(3). Community college employees clearly do not fall within any defined group in sections 126-5(a)(2) or (3). The statute's subsequent listing

---

[7] GTCC points out that other statutory provisions seem to treat community colleges like local governments, whose employees GTCC argues are not treated as "State employees." For example, N.C. Gen. Stat. § 147-33.82, which describes the functions of the Office of Information Technology Services, describes "local governmental entities" to include community colleges for purposes of subsection 147-33.82(b). And, N.C. Gen. Stat. § 147-86.20(5), which defines "State Agency" for purposes of the Statewide Accounts Receivable Program, excludes community colleges (as well as the General Court of Justice) from its definition. Finally, N.C. Gen. Stat. § 12-3.1(b), which defines "Agency" for purposes of setting fees and charges, exempts community colleges from its definition. Importantly, however, it also exempts the University of North Carolina, whose employees GTCC appears to acknowledge (Doc. 25 at 3) would be "State employees." See N.C. Gen. Stat. § 12-3.1(b). These statutory provisions appear to be distinguishable.

16

of exemptions, including the express exemption of "[e]mployees of community colleges," § 126-5(c2)(3), can only be given meaning if one concludes that they would otherwise fall within the meaning of covered "State employees" in section 126-5(a)(1).

Sixth, the provisions of section 126-5 upon which GTCC relies to argue that the SPS distinguishes between "State employees" and community college employees by referring to them separately, N.C. Gen. Stat. §§ 126-5(c5) & (c6), state that Articles 14 and 15 of the SPS nevertheless apply to both groups. Article 14 provides the right of "any State employee" to sue in State superior court for damages and injunctive relief for retaliation for reporting certain acts of wrongdoing. N.C. Gen. Stat. § 126-84. Article 15 prohibits the limitation on "[a] State employee's right to speak to a member of the General Assembly at the member's request." N.C. Gen. Stat. § 126-90. Thus, both Articles address rights of "State employees" and expressly apply them to community college employees.

Seventh, like employees of community colleges, University of North Carolina employees whose salaries are fixed under the authority vested in the Board of Governors are generally exempted from the SPS. N.C. Gen. Stat. § 126-5(c1)(9) (exempting except as to Articles 6 and 7); Univ. of N.C. v. Feinstein, 161 N.C. App. 700, 703, 590 S.E.2d 401, 402 (2003) (noting that "[t]he rights of university employees to challenge

17

any employment action in [the Office of Administrative Hearings] must arise independently from The State Personnel Act"). However, North Carolina courts appear to consider employees of the University of North Carolina system to be "State employees." See, e.g., Teague v. W. Carolina Univ., 108 N.C. App. 689, 424 S.E.2d 684 (1993) (upholding decision of State Personnel Commission that plaintiff, who claimed she was passed over for consideration as Social Research Assistant II, was a "State employee" who was not improperly denied priority consideration). It would seem anomalous that university employees are "State employees" for purposes of the SEFRRA waiver yet community college employees are not.

For all these reasons, the court finds that the General Assembly plainly intended to waive sovereign immunity for "State employees" under SEFRRA and further intended to include employees of community colleges within the meaning of the waiver.

The Second Amended Complaint alleges that Blackburn was "hired" by GTCC and was employed as a housekeeper; otherwise, it does not provide the terms of her employment.[8] (Doc. 28 ¶¶ 8(a),

---

[8] This is important because if Blackburn were an independent contractor, under North Carolina law she would not have been an employee of GTCC and thus not a "State employee" under section 143-300.35. See N.C. Gen. Stat. § 143-300.2(d) (explaining the an "'[e]mployee' includes an officer, agent, or employee but does not include an independent contractor").

8(b).)  The Second Amended Complaint alleges further that her employment ended in "termination," thus indicating that she was an employee of GTCC.  (Id. ¶ 8(j).)  Therefore, the court finds that the Second Amended Complaint alleges that Blackburn was a "State employee" under SEFRRA such that her ADA claim is not barred by the Eleventh Amendment.  Accordingly, GTCC's motion to dismiss based on sovereign immunity will be denied.[9]

## B.  GTCC's Rule 12(b)(6) Motion

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

---

[9]  GTCC does not contend that Blackburn's claim under section 504 of the Rehabilitation Act is barred by the Eleventh Amendment.  See 42 U.S.C. § 2000d-7 ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973[.]"); see also Constantine, 411 F.3d at 491-92 (holding that section 2000d-7 is a constitutional waiver of Eleventh Amendment immunity).

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), abrogated on other grounds by Twombly, 550 U.S. 544), a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," id. Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Id. at 555, 570; see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-51 (2009).

Employment discrimination claims carry no heightened pleading standard, see Twombly, 550 U.S. at 569-70, nor must an employment discrimination complaint contain specific facts establishing a prima facie case, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11, 515 (2002). Yet the Fourth Circuit has not interpreted Swierkiewicz as removing the burden of a plaintiff to plead facts sufficient to state all the elements of her claim. Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764-65 (4th Cir. 2003) (holding that the plaintiff failed to

allege facts sufficient to support all the elements of her hostile work environment claim).

GTCC puts forth two arguments in support of its motion to dismiss. First, it argues that Blackburn has failed to allege sufficient facts to make plausible her allegation that she was qualified to perform the essential functions of her position as housekeeper. Second, it contends that she has failed to allege sufficient facts to support her claim that GTCC regarded her as disabled; rather, it argues, she has alleged only that she was placed on work restrictions by her physician and that she engaged in a "self-initiated opposition to a lack of accommodation in not being placed in some other 'suitable' position." (Doc. 30 at 10.) Blackburn contends that she has sufficiently alleged a "regarded as" claim at this pleading stage.

At the time of the alleged events, Title I of the ADA provided that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[10]  To establish a claim of

---

[10]  The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which became effective on January 1, 2009, changed "with a disability because of the disability of such individual" to "on the basis of disability." See id. § 5(a)(1), 122 Stat. at 3557. For the reasons noted previously, the ADAAA does not apply retroactively to

discriminatory firing under Title I, a plaintiff must prove that (1) she has a "disability," (2) she is a "qualified individual," and (3) in "'discharg[ing]' [her], [her] employer 'discriminate[d] against [her] because of [her] disability.'" Martinson v. Kinney Shoe Corp., 104 F.3d 683, 686 (4th Cir. 1997) (first and fourth alterations in original) (quoting 42 U.S.C. § 12112(a)).[11]

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1).[12] An individual may fall within the "regarded as" category in one of two ways: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life

Blackburn's case. See Blackburn, 733 F. Supp. 2d at 662 n.2; see also Cochran v. Holder, No. 10-1548, 2011 WL 2451724, at *3-*4 (4th Cir. June 21, 2011) (per curiam) (unpublished opinion) (concluding that the ADAAA does not apply retroactively).

[11] Section 504 of the Rehabilitation Act (as amended) prohibits discrimination on the basis of a disability "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The same standards applicable to Title I of the ADA also govern complaints of employment discrimination arising under section 504 of the Rehabilitation Act. Id. § 794(d).

[12] At the time of the alleged events, this provision was located at 42 U.S.C. § 12102(2). See generally, supra, note 10 (discussing the ADAAA).

activities." _Sutton v. United Air Lines, Inc._, 527 U.S. 471,
489 (1999), _superseded by statute_, ADA Amendments Act of 2008,
Pub. L. No. 110-325, 122 Stat. 3553.

Blackburn previously conceded that she is not disabled.
_Blackburn v. Trs. of Guilford Technical Cmty. Coll._, 733 F.
Supp. 2d 659, 663 n.3 (M.D.N.C. 2010). Thus, she proceeds only
on her "regarded as" claim. Moreover, the court previously
addressed and rejected GTCC's argument that Blackburn's
allegations that GTCC regarded her to be disabled were
insufficient, _id._ at 663-64, and the court will not revisit that
ruling here.[13] The sole issue before the court, therefore, is
whether the Second Amended Complaint should be dismissed for

---

[13] It is nevertheless noteworthy that GTCC argues that Blackburn's
allegations indicate only that "the College recognized her physician-
imposed work restrictions prevented her from doing the work of a
Custodian" (Doc. 30 at 10). This is no more than GTCC's
interpretation of the alleged facts. GTCC cites _Wooten v. Farmland_
_Foods_, 58 F.3d 382 (8th Cir. 1995), for the proposition that "an
employer does not regard an employee as disabled when it lays him off
based upon the physical restrictions imposed by a doctor." (Doc. 30
at 10.) But _Wooten_ was a summary judgment decision based on a
detailed factual inquiry, after which the court concluded that the
plaintiff had failed to provide sufficient evidence to establish that
the employer regarded him as disabled rather than merely encumbered by
physician-imposed restrictions that could not be accommodated. _See_ 58
F.3d at 386. Indeed, the issue whether an employer regarded an
employee to be disabled is frequently resolved on a summary judgment
record, because it raises fact issues. 1 Barbara T. Lindemann & Paul
Grossman, _Employment Discrimination Law_ 849 & n.330 (C. Geoffrey
Weirich ed., 4th ed. 2007) (collecting cases); _cf._ _Terry v. City of_
_Greensboro_, No. 1:02CV221, 2003 WL 151851, at *3 (M.D.N.C. Jan. 17,
2003) (granting Rule 12(b)(6) motion but noting (unlike the present
case) that the plaintiff did not allege that he was prevented from
returning to work in any position); _Thomas v. Northern Telecom, Inc._,
157 F. Supp. 2d 627, 632 (M.D.N.C. 2000) (granting Rule 12(b)(6)
motion because plaintiff also alleged the employer gave her excessive
work, which was inconsistent with a claim of perceived disability).

failure to allege facts supporting the plausible inference that Blackburn is a qualified individual.

GTCC argues that Blackburn's allegation that she could perform the essential functions of her position despite her work restrictions is merely a "bare assertion" devoid of factual support. (Doc. 30 at 12.) It further contends that the facts alleged as to her work restrictions — that she could not lift more than 20 pounds, stand or sit for a prolonged period, or bend/stoop/squat repetitively — render implausible her "conclusory" allegation that she could perform the essential functions of her job as housekeeper. Finally, it argues, Blackburn's contention that she was "qualified" is further undermined by her allegations that she was "capable of performing *modified duties* of a regular job" (Doc. 28-1 ¶ 8(k) (emphasis added)) and that GTCC refused to accommodate her limitations.

A "qualified individual" is an individual "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires" and "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). A job function may be "essential" for various

24

reasons, including the fact that the position exists to perform that function, the existence of a limited number of employees available among whom that job function can be distributed, and the fact that the employee was hired for her expertise in that particular function. Id. § 1630.2(n)(2). In determining whether a job function is "essential," a court may consider, among other things, the employer's judgment and the amount of time the employee must spend performing that function. Id. § 1630.2(n)(3)(i), (iii). Further, "[a] plaintiff must show that [s]he can perform the essential functions of the job at the time of the employment decision or in the immediate future." Lamb v. Qualex, Inc., 33 F. App'x 49, 57 (4th Cir. 2002) (unpublished opinion).[14]

Blackburn has plainly alleged that she was employed as a housekeeper, placed on work restrictions (as noted), and released by her physician to return to work "with restrictions" but that GTCC refused to allow her to return because it perceived her to be disabled. (Doc. 28-1 ¶¶ 8(b), 8(d) to 8(f).) She has also alleged that "[d]espite [her] medical limitations, [she] could still perform the essential functions of the employment position." (Id. ¶ 8(l).) She has not alleged the "essential functions" of her job, but GTCC has not presented

_____

[14] Unpublished decisions are not precedential but are cited for their persuasive authority.

case law requiring this at this stage.[15] Cf., e.g., Kirbyson v. Tesoro Ref. & Mktg. Co., No. 09-3990, 2010 WL 761054, at *6 (N.D. Cal. Mar. 2, 2010) (permitting an ADA claim to proceed despite the defendant's argument that the plaintiff needed to "plead, with greater specificity . . . the essential features of the position that he sought to fill, and how [the defendant] was supposed to accommodate him" and noting that "[the defendant] fails to identify any legal authority that suggests that [the plaintiff] must plead this level of particularity at this stage of the litigation"); Imbody v. C & R Plating Corp., No. 1:08-CV-0218, 2009 WL 196251, at *1-*4 (N.D. Ind. Jan. 23, 2009) (denying a Rule 12(b)(6) motion where the plaintiff alleged that he was injured on the job, his physician provided him with a variety of work restrictions (specified in the complaint), he sought accommodation from his employer but was denied it, and his employer terminated him shortly thereafter, although he could perform the essential functions of his job with accommodations and restrictions, and rejecting the employer's argument that the plaintiff "ha[d] not pled enough facts to establish that . . . he could perform the essential functions of

---

[15] EEOC v. Supervalu, Inc., 674 F. Supp. 2d 1007 (N.D. Ill. 2009), cited by GTCC, held that an allegation that the employee was a "qualified individual with a disability" was insufficient where the complaint did not even assert that she could perform the "essential functions" of her job. See id. at 1011, 1014. The opinion did not address whether or to what extent an ADA complaint must list and describe the "essential functions" of her job.

his job").[16] But cf., e.g., Kelley v. Corr. Corp. of Am., 750 F.
Supp. 2d 1132, 1139 (E.D. Cal. 2010) (granting a Rule 12(b)(6)
motion to dismiss a California State-law claim where that law
used the ADA's definition of "qualified individual" and the
complaint "alleges no facts at all to indicate whether Plaintiff
is a qualified individual or what the essential elements of her
job are or what the essential elements of an alternative job
might be"); Gladden v. Winston Salem State Univ., 495 F. Supp.
2d 517, 522 (M.D.N.C. 2007) (finding the allegation that
"Plaintiff is a disabled individual who, with reasonable
accommodations can perform his job duties," to be conclusory and
"insufficient" to satisfy the requirement that "with reasonable
accommodation he could perform the essential functions of the
position" because it "merely recite[d] the language of the
applicable cause of action").

      Contrary to GTCC's argument, Blackburn's allegation that
she could perform "modified duties" of a "regular job" (Doc. 28-
1 ¶ 8(k)) does not necessarily mean that she could not perform
her job's "essential functions."  A determination of whether the
"modified duties" Blackburn claims she could perform would have
satisfied the "essential functions" of her job ultimately

---

[16]   These cases are cited for their interpretations of the applicable
pleading standard as it relates to the "qualified individual"
requirement.   The court does not address here the issue of an
employer's duty to accommodate a plaintiff alleging "regarded as"
liability.  Cf. Blackburn, 733 F. Supp. 2d at 665 (holding the "better
reasoned view" to be that no such duty exists).

requires a detailed factual inquiry, which ordinarily would be
decided on a factual record.[17] _C.f., e.g.,_ _Hayes v. Elementary_
_Sch. Dist. No. 159_, No. 10-C-7095, 2011 WL 1059890, at *3 (N.D.
Ill. Mar. 21, 2011) ("[W]hether or not [the plaintiff] was able
to perform her job with or without reasonable accommodations
involves a factual analysis regarding [her] physical condition
and job duties that is far beyond the scope of the pleadings."
(denying a Rule 12(b)(6) motion)); _Liss v. Nassau Cnty.,_ 425 F.
Supp. 2d 335, 342 (E.D.N.Y. 2006) (in a pre-_Twombly_ decision,
denying a Rule 12(b)(6) motion because although "[t]he plaintiff
alleges no facts regarding the 'essential functions' of his
employment, or that support the inference that he was unable to
perform these essential functions," "the question of what tasks
the plaintiff could and could not perform . . . is one of fact

---

[17] Significantly, Blackburn elsewhere suggests that modifications may
not have been necessary, tracking the statutory language and alleging
that she "could still perform the essential functions of the
employment position with _or without reasonable accommodations_." (Doc.
28-1 ¶ 8(_l_) (emphasis added).) Thus, her "modified duties" allegation
(id. ¶ 8(k)) and her allegation that she was "capable of performing
the duties of several available suitable positions" (id. ¶ 8(j)) need
not be taken as establishing that she could not perform her original
job, at least at this pleading stage.

GTCC's related argument that Blackburn's Charge of Discrimination
filed with the United States Equal Employment Opportunity Commission
(Doc. 29-1 at 2-3; see Doc. 30 at 17-18 (passing reference)) shows
that Blackburn could not perform the "essential functions" of her job
was not developed until GTCC's reply brief (see Doc. 35 at 4), leaving
Blackburn no meaningful opportunity to respond. Even so, the Charge's
statement that GTCC "failed to provide [Blackburn] with a reasonable
accommodation and terminated [her] due to [her] medical condition"
(Doc. 29-1 at 2) does not necessarily imply that she could not perform
the "essential functions" of her position.

and, therefore, not appropriate for determination on a motion to dismiss"). It is noteworthy that the few ADA cases GTCC cites in support of its argument were not decided on the pleadings but rather on summary judgment after a factual record had been developed to allow a comparison of the employee's abilities and limitations with the "essential functions" of the job. This is consistent with the court's review of the case law. Cf., e.g., 1 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 853 & n.342 (C. Geoffrey Weirich ed., 4th ed. 2007) (listing federal appellate court decisions conducting or requiring "a factual comparison of the [plaintiff's] abilities, with or without reasonable accommodation, with the essential functions of the job at issue," all after the submission of evidence).

GTCC contends that "[m]edical restrictions are . . . highly relevant to the question of whether an employee has a colorable claim under the ADA," Williams v. Avnet, Inc., 910 F. Supp. 1124, 1131 (E.D.N.C. 1995),[18] and it points to Blackburn's alleged restrictions on lifting more than 20 pounds, standing or sitting for a prolonged time, and repetitively bending, stooping, or squatting (see Doc. 28-1 ¶ 8(d)). The effect of Blackburn's alleged restrictions on her ability to perform the

---

[18] The Fourth Circuit affirmed Williams on other grounds and did not reach the holding relevant to GTCC's quotation. See Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 n.3 (4th Cir. 1996) (per curiam).

"essential functions" of her job, however, cannot be determined without a fact-specific inquiry that is not possible on this record, as discussed above.

At the pleading stage, the court is not tasked with determining the merits of a claim, only whether it is plausibly stated. At this preliminary stage, the court finds that while Blackburn pushes the envelope on the minimum required to survive a motion to dismiss, her Second Amended Complaint sufficiently alleges that she could perform the "essential functions" of her job as housekeeper, particularly since she was apparently capable of doing so before her work-related injury (see id. ¶¶ 8(b), 8(c)). The court cannot determine as a matter of law that her claimed post-injury ability to do so was not plausible, where the "essential functions" of her job are not before the court and a fact-specific inquiry will be necessary. Therefore, the court finds that the Second Amended Complaint pleads facts sufficient to raise Blackburn's right to relief above the speculative level, even if only marginally so. Whether she can prove her claim remains for another day.

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that GTCC's motion to dismiss Blackburn's Second Amended Complaint pursuant to Federal Rules

of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6) (Doc. 29) is DENIED.

<u>   /s/ Thomas D. Schroeder   </u>
United States District Judge

September 30, 2011